UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ELAINE L. CHAO, Secretary of Labor,  :   Civil Action
United States Department of Labor
                                      :   No.
                  Plaintiff,

      v.

                                    :
The Charles Schwab Corporation,
Charles Schwab & Co, Inc.,
Charles Schwab Bank,
                                    :

               Defendant.  :

---

## PETITION TO ENFORCE THE SECRETARY'S ORDER TO IMMEDIATELY REINSTATE RICK LIEBCHEN & SCOTT WERLING

Plaintiff, Elaine L. Chao, Secretary of Labor, United States Department of Labor, hereinafter "the Secretary", brings this action to enforce the provisions of section 806 of the Sarbanes-Oxley Act of 2002, hereinafter "the Act" (18 U.S.C. § 1514A) and the Rules for Implementing Section 806 of the Act, hereinafter "Rule(s)" (29 C.F.R. Part 1980), by enjoining the defendant, The Charles Schwab Corporation, Charles Schwab & Co., Inc., Charles Schwab Bank (collectively Schwab), from failing to reinstate two employees found by the Secretary to have been discriminatorily discharged by the defendant in violation of section 806(a) of the Act.

I

Jurisdiction of this action is conferred upon the Court by Section 806(b)(2)(A) of the Act (18 U.S.C. § 1514A(b)(2)(A)), incorporating provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), 49 U.S.C. § 42121(b)(5).

II

The defendant Schwab is, and at all times hereinafter mentioned, was, a corporation duly organized under the laws of the State of Delaware and doing business in New Jersey, as Charles Schwab & Company at 374 Milburn Avenue, Milburn, New Jersey 07041. The employment and subject discharge of the employees took place within the jurisdiction of this court.

III

The defendant Schwab is, and at all times hereinafter mentioned, was, a company with a class of securities registered under section 12 of the Securities Exchange Act (15 U.S.C. § 78l) within the meaning of section 806(a) of the Act (18 U.S.C. § 1514A(a)), providing investment services including online investing, financial advice and banking solutions.

IV

Pursuant to section 49 U.S.C. § 42121(b)(1) (incorporated into 18 U.S.C. § 1514A(b)(2)(A)) and 29 C.F.R. §1980.103(d), a complaint was timely filed with the Secretary on June 15, 2007 by Rick Liebchen and Scott Werling, former employees of the defendant, alleging that the defendant discriminatorily discharged them because they objected to and refused to participate in a scheme to falsify entries in the Multi-channel Acquisition Relationship Sales ("MARS") software system in violation of Federal securities laws, allegations of violations of section 806(a) (18 U.S.C. § 1514A(a)).

V

Pursuant to 49 U.S.C. § 42121(b)(1) and (2) (incorporated into 18 U.S.C. § 1514A(b)(2)(A)), and 29 C.F.R. § 1980.104, the Secretary, acting through her agent, the Regional Administrator for Occupational Safety and Health, Region II, hereinafter "the Regional Administrator", notified the defendant of the filing of the complaint by employees Rick Liebchen and Scott Werling, and thereafter conducted an investigation to determine whether or not there existed reasonable cause to believe that the complaint had merit.

VI

On June 26, 2008, as a result of the investigation of the employees' complaint, the Regional Administrator, pursuant to 49 U.S.C. 42121 (b)(2)(A) (incorporated into 18 U.S.C. § 1514A(b)(2)(A)) and 29 C.F.R. §1980.105(a) (1), issued to the defendant written initial findings that there was reasonable cause to believe that the defendant had discharged employees Rick Liebchen and Scott Werling on March 20, 2007 for engaging in protected activity, in violation of section 806(a) of the Act (18 U.S.C. § 1514A(a)), and offered the defendant an additional opportunity to present contrary evidence. On July 28, 2008, the defendant submitted a response to OSHA, which was followed up with a meeting with the OSHA investigator and supervisory investigator, at the defendant's request, on August 2, 2008. Little new evidence was proffered in this meeting.

VII

On October 21, 2008, following a review of and consideration of all of the evidence gathered during the investigation, including the defendant's letter of contest and submission of documentation and evidence, the Regional Administrator issued, pursuant to 49 U.S.C. § 42121(b)(2)(A) and 29 C.F.R. § 1980.105(a) (1), to the defendant a preliminary order in the

matter styled: The Charles Schwab Corporation, Charles Schwab & Co, Inc., Charles Schwab Bank, Larry Goldstein, Scott Jensen & John Foy / Liebchen & Werling / 2-2140-07-008 (18 U.S.C. § 1514A) – Secretary's Findings/Preliminary Order. A copy of that order is attached as Exhibit 1 hereto. In that order, the Regional Administrator directed that the defendant immediately reinstate Rick Liebchen and Scott Werling to their former positions as Financial Consultants with the Millburn, New Jersey branch office. The Regional Administrator's Findings and Order are annexed to this Petition and are incorporated herein by reference.

VIII

Pursuant to 49 U.S.C. § 42121(b)(2)(A) (incorporated into 18 U.S.C. § 1514A(b)(2)(A)) and 29 C.F.R. § 1980.105(c) and § 1980.109(c), the reinstatement order of the Regional Administrator is effective immediately.

IX

The defendant Schwab has failed to comply with the order to reinstate employees Rick Liebchen and Scott Werling issued by the Regional Administrator.

X

This Court is authorized to enforce the October 21, 2008 order of the Regional Administrator, pursuant to 49 U.S.C. § 42121(b)(5) and 29 C.F.R. § 1980.113, directing the defendant to immediately reinstate Rick Liebchen and Scott Werling to their positions of Financial Consultants.

WHEREFORE, good cause having been shown, Plaintiff respectfully prays for judgment against the defendant:

1) enforcing the October 21, 2008 Preliminary Order of Reinstatement in the administrative proceeding styled: The Charles Schwab Corporation, Charles Schwab & Co, Inc.,

Charles Schwab Bank, Larry Goldstein, Scott Jensen & John Foy / Liebchen & Werling / 2-2140-07-008(18 U.S.C. 1514A) – Secretary's Findings/Preliminary Order, ordering the defendant immediately to reinstate Complainants to their former positions as Financial Consultants with the Millburn, New Jersey branch office; and,

2) temporarily and preliminarily enjoining the defendant, its agents, servants, employees, and those persons in active concert or participation with them or acting in their interest from failing to comply with the October 21, 2008 Preliminary Order of Reinstatement, and from refusing to reinstate former employees Rick Liebchen and Scott Werling, as ordered, until such time as the administrative and judicial review procedures contained in 49 U.S.C. § 42121 and 29 C.F.R. Part 1980, are concluded.


DATED:   November 17, 2008


                                                    Respectfully submitted,
                                                    CHRISTOPHER J. CHRISTIE
                                                    United States Attorney

                                                    ss/ *Daniel J. Gibbons*

                                                    _____
                                                    DANIEL GIBBONS
                                                    Assistant U.S. Attorney

GREGORY F. JACOB
Solicitor of Labor

PATRICIA M. RODENHAUSEN
Regional Solicitor

MARGARET TEMPLE
Attorney

Exhibit 1



U.S. Department of Labor

Occupational Safety and Health Administration
201 Varick Street, Room 670
New York, New York 10014
Tel: (212) 337-2378
Fax: (212) 337-2371

October 21, 2008

Jill Rosenberg, Esq.
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103-0001

Via Federal Express # 8582 5805 2278

RE: The Charles Schwab Corporation, Charles Schwab & Co, Inc., Charles Schwab Bank, Larry Goldstein, Scott Jensen & John Foy / Liebchen & Werling / 2-2140-07-008

Dear Ms. Rosenberg:

This is to advise you that we have completed our investigation of the above-referenced complaint filed by Rick Liebchen and Scott Werling (Complainants) against The Charles Schwab Corporation, Charles Schwab & Co., Inc., Charles Schwab Bank (collectively, Schwab), and Larry Goldstein, Scott Jensen and John Foy (the named persons) on May 2, 2008, under the employee protection provisions of Section 806 of the Corporate and Criminal Fraud Accountability Act, Title VII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1514A (SOX). In brief, Complainants alleged that Respondents terminated their employment on March 20, 2007 and subsequently made "defamatory" entries on Complainants' U-5s (Uniform Termination Notice For Securities Industry Registration), in violation of SOX.

Following an investigation by a duly authorized investigator, the Secretary of Labor, acting through her agent, the Regional Administrator for the Occupational Safety and Health Administration, Region II, finds that there is reasonable cause to believe that Respondents violated SOX and issues the following findings:

### Secretary's Findings

On June 15, 2007, Complainants filed a complaint with the Secretary of Labor alleging that Respondents retaliated against them in violation of SOX. As the complaint was filed within 90 days of the alleged adverse actions, it is deemed timely.

The Charles Schwab Corporation is a company within the meaning of 18 U.S.C. §1514A, in that it is a company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) and is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)).

Charles Schwab & Co., Inc. and Charles Schwab Bank are wholly-owned, consolidated subsidiaries of The Charles Schwab Corporation. Respondents have contested coverage under



SOX. OSHA applies the integrated employer test in determining whether subsidiaries of a covered employer should be viewed as one enterprise for statutory coverage purposes. As discussed below, OSHA finds that Respondents The Charles Schwab Corporation, Charles Schwab & Co., Inc., and Charles Schwab Bank constitute an integrated employer.

A company and its subsidiaries constitute a covered company under SOX if it is demonstrated that the entities are an integrated employer. The integrated employer test contains four elements: centralized or unified control of labor or employment decisions; interrelation of operations; common management; and common ownership or financial control. As summarized below, we find that there is reasonable cause to believe that Schwab is an integrated employer.

### A. Centralized or Unified Control of Labor or Employment Decisions

Schwab uses one corporate website to recruit prospective employees to apply for positions with the various subsidiaries. For example, in the "Careers" section of Schwab's corporate website[1], website visitors are urged to "Discover how you can be part of Schwab in your community, working as a Financial Consultant at a local Charles Schwab branch." In Schwab's corporate structure, Financial Consultants in local Charles Schwab branches are typically employees of Charles Schwab & Co, Inc., and Charles Schwab Bank, as were Complainants.

Employees of subsidiaries receive stock options in the parent company's stock as part of their compensation package. Complainants, upon the commencement of their employment, received a letter from The Charles Schwab Corporation explaining their stock options in the parent company's stock.[2] Additionally, The Charles Schwab Corporation offers an "Employee Stock Purchase Plan" through which employees of the subsidiaries may purchase stock in the parent corporation at a discount (85% of the fair market value).[3] Moreover, The Charles Schwab Corporation offers stock incentive plans which provide restricted stock awards to employees and officers of the subsidiaries.[4]

### B. Interrelation of Operations

Schwab conducts its business in a manner in which its corporate boundaries are transparent, both to employees and customers. For example, The Charles Schwab Corporation's SEC Form 10-K filed in fiscal year 2007 states that "the Company offers a multi-channel service delivery model which includes branch, telephonic, and online capabilities. Under this model, the Company can offer personalized service at competitive prices while giving clients the choice of where, when, and how they do business with the firm. Schwab's branches and regional telephone service centers are staffed with trained and experienced financial consultants (FCs) focused on building and sustaining client relationships. The Company offers the ability to meet client investing needs through a single ongoing point of contact, even as those needs change over time. In particular, management believes that the Company's ability to provide those clients seeking help, guidance,

---

[1] http://www.aboutschwab.com/careers/
[2] Copies of these letters are in the record.
[3] FY 2007 Form 10-K, page 51.
[4] FY 2007 Form 10-K, page 63.



or advice with an integrated, individually tailored solution – ranging from occasional consultations to an ongoing relationship with a Schwab FC or an IA – is a competitive strength versus the more fragmented offerings of other firms."[5]

Schwab conducts its business through business segments, rather than corporate entities. Specifically, it conducts business through "Schwab Investor Services, Schwab Institutional, and Schwab Corporate and Retirement Services"[6]

The Charles Schwab Corporation conducts substantially all of its business through wholly-owned subsidiaries. "The capital structure among CSC [Charles Schwab Corporation] and its subsidiaries is designed to provide each entity with capital and liquidity to meet its operational needs and regulatory requirements."[7]

### C. Common Management

Schwab's common management is apparent. For example, the biography of Charles R. Schwab from Schwab's corporate website states: "Mr. Schwab, age 70, has been Chairman and a director of The Charles Schwab Corporation since its incorporation in 1986. Mr. Schwab was re-appointed as Chief Executive Officer of the company in 2004. He served as Co-Chief Executive Officer of the company from 1998 to 2003, and Chief Executive Officer of the company from 1986 to 1997. Mr. Schwab was a founder of Charles Schwab & Co., Inc. in 1971, has been its Chairman since 1978, and its Chief Executive Officer since 2004. Mr. Schwab is Chairman of Charles Schwab Bank and Chairman and trustee of The Charles Schwab Family of Funds, Schwab Investments, Schwab Capital Trust and Schwab Annuity Portfolios, all registered investment companies."[8]

Also, the Executive Vice President, Corporate Oversight and General Counsel for the corporate parent is on the management committee and is described as "Carrie E. Dwyer heads Corporate Oversight for The Charles Schwab Corporation and Charles Schwab & Co., Inc., its principal operating company. Dwyer's responsibilities include corporate counsel, domestic and international compliance, risk management and fraud investigations, internal audit and government affairs. Dwyer is co-chair of the global risk policy committee of The Charles Schwab Corporation."[9]

### D. Common Ownership and Financial Control

Charles Schwab & Co., Inc., and Charles Schwab Bank are wholly owned, consolidated subsidiaries of The Charles Schwab Corporation. Respondent's SEC Form 10-K filed in fiscal year 2007 states that "Management of The Charles Schwab Corporation, together with its

---

[5] FY 2007 Form 10-K, page 2.
[6] FY 2007 Form 10-K, page 3.
[7] FY 2007 Form 10-K, page 27.
[8] http://www.charlesschwabfoundation.net/governance/board/index.html. Also see: http://www.aboutschwab.com/governance/management/schwab.html.
[9] http://www.aboutschwab.com/governance/management/dwyer.html.



subsidiaries (the Company), is responsible for establishing and maintaining adequate internal control over financial reporting."[10] Thus, Charles Schwab & Co., Inc., and Charles Schwab Bank are under common ownership and financial control of the parent.

Therefore, OSHA finds that Respondents The Charles Schwab Corporation, Charles Schwab & Co., Inc., and Charles Schwab Bank constitute an integrated employer, and that Schwab is covered under SOX.

At all times relevant to this complaint, Larry Goldstein,[11] Scott Jensen[12] and John Foy[13] were officers and/or employees of Charles Schwab & Co., Inc. and are therefore covered under SOX.

On or about March 16, 2002, Respondent Charles Schwab & Co., Inc. hired Complainant Rick Liebchen as a Financial Consultant in the branch located in Millburn, New Jersey. Mr. Liebchen held a variety of securities licenses. On or about July 30, 2004, Respondent Charles Schwab & Co., Inc., hired Scott Werling as a Financial Consultant in the same office. Mr. Werling held a variety of securities licenses. Complainants are both employees covered under 18 U.S.C. §1514A.

Complainants allege that they were terminated because they objected to and refused to participate in a scheme to falsify entries in the Multi-channel Acquisition Relationship Sales ("MARS") software system. The MARS system is a record keeping system used by Schwab. As registered investment advisors and broker-dealers, Schwab is subject to record keeping regulations promulgated by the U.S. Securities and Exchange Commission under both the Securities Exchange Act of 1934 (see e.g., Rule 17a-3 and 17a-4) and the Investment Advisors Act of 1940 (see e.g., Rule 204-2). In addition, Self Regulatory Organization (SRO) rules and regulations carry penalties for firms and employees who falsify customer records (see e.g., NASD / FINRA Conduct Rule 3110 – Books and Records).

The evidence establishes that employees are told in various internal Schwab policies and training materials that falsifying company records violates company policy and federal securities laws. Therefore, we find that that a reasonable employee would believe that making false entries in company records, including MARS, would constitute a violation of the Company's books and records policy, SRO rules and federal law.

The MARS system is used by Schwab employees to record the implementation and creation of "opportunities" (i.e., customer contacts in an effort to generate new assets into Schwab). The Financial Consultants were also trained to use the MARS system to record the "closing" or the completion of these "opportunities" (i.e., sales). The compensation of Financial Consultants and the compensation of branch management are dependent on their "closing" of "opportunities," all

---

[10] FY 2007 Form 10-K, page 86.
[11] Branch Manager of the Millburn New Jersey branch office until January 16, 2007.
[12] Branch Manager of the Red Bank New Jersey branch and after January 16, 2007 Branch Manager of both Red Bank and Millburn branch offices.
[13] Regional Branch Executive, Mid-Atlantic Region (comprising 26 branches and including branches in New Jersey). Branch Managers in this region report directly to Mr. Foy.



of which would be recorded in MARS. Thus, the compensation of the Financial Consultants and the performance of the branch offices are linked to MARS.[14]

In the fourth quarter of 2005, the Charles Schwab Millburn Office was given an internal, unfavorable rating of "F," in comparison to the approximately 300 other Schwab branch offices in the rest of the country. The Millburn office continued to be rated with an "F" throughout the remaining period of Complainants' employment and beyond. This rating reflected poorly on the performance of the Millburn Branch Manager and on that of the employees of that branch. On August 16, 2006, Respondent John Foy, Charles Schwab & Co., Inc.'s Regional Branch Executive responsible for the Millburn Branch, issued an email to the branch office stating that the branch needed to "improve the numbers of conversations [with potential customers] you are having daily." Mr. Foy states that the Millburn Branch had either the lowest or second to lowest number of customer contacts of all 26 of the branches in his region.

Sometime after August 16, 2006, Respondent Larry Goldstein, the Millburn office's Branch Manager, convened a staff meeting where Complainants and witnesses allege that Mr. Goldstein directed his staff of Financial Consultants to falsify and embellish their entries in the MARS system in an attempt to improve the rating of the Millburn branch office and to improve his own standing.[15] Goldstein then directed the Financial Consultants to falsify MARS entries, although recollections of the exact words used vary among the witnesses.[16] Witnesses stated that Goldstein was angry and pounded on the table, saying that the "F" rating was unacceptable, and that employees had to "do whatever you have to do" to improve the "F" rating of the office. Goldstein told employees to increase the number of customer contact entries in MARS, "fact or fiction." Complainants both objected during the staff meeting, stating "why should we force entries just to make management look good?"

Immediately after this staff meeting, which occurred sometime after August 16, 2006, Complainants and other employees congregated in the cubicle of Steve Carleu, a Financial Consultant. Complainants complained to Carleu that Goldstein was asking them to fabricate MARS notes, which jeopardized their jobs and their licenses. Carleu was a designated Acting Branch Manager[17] in the absence of Goldstein. While Carleu denied that Goldstein had actually

---

[14] Respondent Schwab denies that the compensation of Financial Consultants is linked to MARS, however, the Financial Consultants believe that their closure of an "opportunity" in MARS is linked to their compensation. Also, various data on individual and branch performance is culled from MARS in reports, thus the performance of the branch offices are linked to MARS.

[15] Based on all of the interviews, it is believed that the following Financial Consultants were present at the meeting: Rick Liebchen, Scott Werling, Lisa Bohannon, Cynthia Spekhart, Steve Carleau and Eric Passin. It is generally agreed that Kathleen Doherty (Client Service Specialist), John Jaeger (Operations Manager) and Peter Pavlakis (Private Client Consultant) were not present.

[16] Carleau and Goldstein denied that Goldstein had told Financial Consultants to falsify MARS entries. However, their denials were contradicted by the statements of multiple witnesses interviewed during OSHA's investigation.

[17] Both Carleau and Jaeger were designated as "Acting Branch Manager" at times when Mr. Goldstein was not in the office. Both state that they had no disciplinary authority when functioning in this capacity and primarily would sign off on sales related paperwork. However, the "Acting Branch Manager" designation stems from securities industry compliance requirements that there be an individual in the branch with a FINRA "Series 10" license (General Securities Sales Supervisor-General Module), therefore an Acting Branch Manager is a "person working for the employer who has the authority to investigate, discover, or terminate misconduct."



instructed Financial Consultants to fabricate entries, Carleu acknowledged that Complainants told him that they did think that Goldstein had instructed Financial Consultants to fabricate entries after the meeting, although he stated "I didn't know if they were joking or serious." Complainants' belief that Mr. Goldstein's directive violated company policy and federal law was shared by other witnesses interviewed during OSHA's investigation. Additionally, Complainants' objections to Goldstein's directive, both during and after the meeting, were confirmed by multiple witnesses interviewed during OSHA's investigation.

One Financial Consultant admitted to OSHA that he obeyed the order and fabricated entries. Another Financial Consultant stated that she got around the order in other ways, such as making entries in MARS for notarizing documents, an activity normally not tracked there. A third stated that she didn't need to fabricate entries since her numbers were sufficient. One Financial Consultant laughed when OSHA informed her that Goldstein had denied ordering Financial Consultants to fabricate entries in MARS: "what else is he going to say -- that's fraud -- of course he would say that." Complainants refused to fabricate entries and would later suffer for it.

Complainants engaged in protected activity under SOX when they told Goldstein "repeatedly" that they thought falsifying entries in MARS violated the law. Goldstein was a "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)" See 18 U.S.C. §1514A(1)(C). Carleu was a designated Acting Branch Manager in the absence of Goldstein. Therefore, Complainants engaged in additional protected activity when they complained to Carleu after the staff meeting. Complainants' refusals to obey this unlawful order also constitute protected activity.

Witnesses corroborate that Goldstein continued to instruct Financial Consultants to falsify and embellish their MARS entries in the days following the above-mentioned staff meeting, and that Complainants continued to oppose his instructions. OSHA's investigation indicates that Mr. Goldstein threatened to take actions against Complainants specifically and also in general against employees who "were not on board" with his instructions. "If I'm going down, I'm taking all of you with me," one witness recounts his saying. Two witnesses recall Mr. Goldstein specifically blaming Complainants for his demise as Branch Manager and threatening that Complainants would pay for it.

On January 16, 2007, Respondent Jensen replaced Goldstein as the Branch Manager of the Millburn office. On the same day, Respondent Jensen issued a written warning to Complainant Werling for poor performance, even though he had not yet supervised him (the written warning had been started by Goldstein). Goldstein remained in the office as a Financial Consultant. While Respondent Schwab contends that Goldstein took the downgrade for personal reasons, many employees believe that Mr. Goldstein was forced out due to the poor performance of the Branch. Many employees also believe that due to the close friendship of Goldstein, Foy and Jensen (the three were known to employees as the "the boys' club"), Goldstein was given a position as a Financial Consultant instead of being terminated. OSHA's investigation indicates that Goldstein blamed Complainants for his downfall and threatened to retaliate against them.



Over the weekend of March 3-4, 2007, the named persons Jensen and Goldstein worked together in the Millburn office. Three days later, on Wednesday March 7, 2007, Respondent Jensen issued an email to all staff in the Millburn office referencing "golf ball marks in the walls." In this email, he asked that anybody with information on who had caused the marks to come forward. Nobody did. Jensen notified Respondent Foy when nobody stepped forward. Foy stated that if nobody stepped forward by that Friday, he would make an unannounced visit to the branch the following Monday to deal with the situation.

On March 8, 2007 – the day after Jensen's email – Complainants spackled golf ball marks on a wall during their lunch break. At 1:25 p.m. on March 8, 2007, Goldstein sent an email to Jensen with the subject line: "I see…" and in the body of the email "Werling an [sic] Liebchen both working on the hole in the wall to try to fix it?" Jensen forwarded this email with only "FYI" as a comment to Natasha Radden at 1:35 p.m. on March 8, 2007. Radden works in the Corporate Office Human Resources Department at The Charles Schwab Corporation.

On Monday March 12, 2007, Foy visited the branch and after a staff meeting, met individually with Steve Carleu (Financial Consultant), Kathleen Doherty (Client Service Specialist), and John Jaeger (Operations Manager).[18] The above-referenced employees identified Liebchen as the perpetrator of the damage to the office walls and indicated that Complainants had regularly engaged in acts of horseplay in the office. Based on this information, Foy met with Liebchen who admitted to the golf ball damage and "horseplay." Liebchen was placed on immediate administrative leave. Foy then met with Werling. Werling admitted that he had seen Liebchen damage the walls with golf equipment and admitted to engaging in horseplay in the office.

Respondents knew that there had been golf ball marks on the walls in the office since sometime in 2006. Numerous Financial Consultants were golf aficionados and kept golf equipment in the office. In 2006, Goldstein had asked Liebchen to spackle an alleged golf ball mark on a wall. He also stated that in 2006 Liebchen had responded to his question about golf ball marks on the wall by asking him, "What, haven't you ever shanked one before?" Goldstein told Complainant to fix the mark at his own expense, which he did. Goldstein did not take any disciplinary action against Liebchen or issue any warnings to Liebchen about those golf ball marks. Indeed, prior to March 2007, neither Goldstein nor any other Respondent manager had ever issued any warning to employees about golf ball marks, golf equipment or anything concerning golf. It is undisputed that Schwab uses golf to generate business and that golfing is part of Schwab's marketing to clients. In fact, Schwab purchased memberships for Financial Consultants in the Royce Brook Country Club located in Hillsboro, New Jersey, where they could invite clients to play rounds of golf. Additionally during the period of Complainants' employment with Schwab, many employees in the Millburn office had various golf paraphernalia in their offices, and even had golf equipment that they purchased for themselves delivered to Schwab's Millburn office.

---

[18] The three employees that Foy selected to meet with individually here, happen to be the same three witnesses whose testimony was most favorable to Respondents in OSHA's investigation. Two of the three, at the time of OSHA's investigation, still worked for the Millburn New Jersey branch office of Schwab and the other worked at a different branch in New Jersey.



On March 12, 2007, Liebchen was placed on administrative leave, purportedly for damage he caused to the walls of the office. On March 20, 2007, both Liebchen and Werling were fired, purportedly for "inappropriate behavior and horseplay in the branch." The following entries were subsequently made on Complainants' U-5s: (Werling) "INAPPROPRIATE CONDUCT DURING WORK" and (Liebchen) "FAILURE TO ADHERE TO COMPANY POLICY – NON-SALES PRACTICE RELATED."

It is undisputed that Complainant Werling never participated in any golfing activity. Rather, Respondents have asserted that Werling was terminated for "inappropriate workplace conduct." Mr. Foy also stated that Werling was present during Complainant Liebchen's golfing in the office, and he did not report the "misconduct" to management. However, none of the other employees who were interviewed by Foy on March 12, 2007 ever came forward to report Complainants' "misconduct" to management, yet they did not lose their jobs.

With regard to the horseplay in the office, credible witness statements, have demonstrated that employees in the office, with few exceptions, engaged in horseplay to let off steam. Most of this occurred after hours or when there were no clients in the office. Indeed, the evidence indicates that supervisors threw the "gator" football[19] in the office, putted golf balls, swung golf clubs in the office, and participated in pool football, as did other employees. Witnesses have corroborated that other employees have engaged in seemingly more egregious conduct and have suffered no discipline.

The evidence indicates that Complainants were treated differently than other employees at the branch. Simply put, for Liebchen and Werling to be terminated for "inappropriate behavior and horseplay in the branch" given the environment described by the witnesses, is not credible. The evidence indicates that no other employees have been disciplined for "inappropriate behavior and horseplay in the branch," although the evidence indicates that other employees engaged in such conduct. We also note that the record lacks evidence of any effort by management to implement any notices, policies, warnings, or emails to employees prohibiting golf-related or other horseplay in the office. While management certainly could have done so if they viewed this as a problem in the office, it did not. Thus, Respondents' proffered reasons for the terminations of Complainants in these circumstances are pretext, and if complainants had obeyed orders and falsified MARS entries as instructed by Goldstein, they would still be employed at Schwab today. Further, Respondents are responsible for entries made on Complainants' U-5s which are in violation of Section 806 of SOX.[20]

On June 26, 2008, OSHA sent Respondents its initial findings that it had reasonable cause to believe that Complainants' protected activity was a contributing factor in the adverse actions taken against them. All evidence and witness interviews were provided to the parties with the

---

[19] This was described by witnesses as a foam football and the term "gator" apparently has to do with the University of Florida Gators (a college football team).

[20] "Defamatory" language in a U-5 can be expunged. See e.g., SEC Release No. 34-57572: It is FINRA's current practice to permit expungement, without judicial intervention, of information from the Central Registration Depository ("CRD") system as directed by arbitrators in intra-industry arbitration awards that involve associated persons and firms based on the defamatory nature of the information ordered expunged.



initial findings. OSHA afforded Respondents opportunities to submit additional evidence and argument. On July 28, 2008, Respondent submitted a response to OSHA, which was followed up with a meeting with the OSHA Investigator and Supervisory Investigator, at Respondent's request, on August 2, 2008. Little new evidence was proffered in this meeting. Respondent again presented their case and attempted to convince OSHA where the agency had erred in the analysis of the evidence in the initial findings. After this meeting, three additional interviews were conducted. One of the witnesses was not present at the staff meeting where Respondent Goldstein allegedly told Financial Consultants to falsify MARS entries, but the other two witnesses were. The testimony of these two witnesses clearly supported Complainants' prima facie allegation. These additional three witness interviews were provided to the parties. On September 19, 2008, the parties submitted their final arguments to OSHA.

Neither the new information submitted by Respondents nor the additional witness interviews that have been conducted has persuaded OSHA to alter its preliminary findings that there is reasonable cause to believe that Respondents violated SOX.

The circumstances in this case are sufficient to raise the inference that Complainants' protected activity was a contributing factor in the adverse actions taken against them. Complainants have made a *prima facie* showing that protected behavior or conduct was a contributing factor in the unfavorable personnel actions alleged in the complaint. Accordingly, OSHA finds that there is reasonable cause to believe that Respondents violated SOX. OSHA hereby orders the following to remedy the violations:

## Preliminary Order

1. Upon receipt of this Secretary's Findings and Preliminary Order, Respondents shall immediately reinstate Complainants to their former positions as Financial Consultants with the Millburn, New Jersey branch office.[21] Such reinstatement shall include all rights, seniority and benefits that they would have enjoyed had they never been discharged. Such reinstatement is not stayed by an appeal of this order.

2. Respondents shall petition FINRA to have these violative entries expunged from Complainants U-5s and to have Complainants reinstated with FINRA as Respondents' employees. Respondents shall bear all costs associated with the expungement of the U-5s. Should FINRA require a confirmation by a court of competent jurisdiction, Respondent shall bear all responsibility and costs of obtaining such confirmation as well.

3. Respondents shall expunge Complainants personnel files of any reference to the discharge and any reference to the incidents that Respondents purported to have used as a basis of the discharge. Respondents shall provide Complainants with a complete copy of their personnel file upon completion of this expungement.

---

[21] Should the parties mutually agree on a different branch office for physical reinstatement, OSHA would have no objections, however, OSHA is ordering physical reinstatement and "economic reinstatement" will not suffice for purposes of this preliminary reinstatement order.



4. Respondents shall, to the extent possible, restore to Complainants the customer accounts that were stripped from them as a result of their terminations. If it is not possible to restore all of their customer accounts, Respondent must give priority placement of new accounts to Complainants until their business volume is reestablished at the level they would have had if the terminations had never taken place.

5. Respondents shall pay each Complainant back pay and bonuses, minus interim earnings, equal to the top earning Financial Consultant with the Millburn, New Jersey branch office during the period of March 20, 2007 until Respondents make Complainant a bona fide offer of reinstatement. Respondents shall pay Complainants interest on the back wages and bonuses in accordance with 26 USC 6621.

6. Respondents shall pay each Complainant compensatory damages for pain and suffering and loss of client relationships in the amount of $75,000.

7. Should Respondents be unsuccessful in expunging Complainants' U-5s in accordance with #2 above, Respondents shall pay Complainants additional compensatory damages for defamation and damage to reputation in the amount of $2,000,000 each.

8. Respondents shall pay Complainants' attorney's fees in the amount of: $160,386.23.

9. Respondents shall post immediately the attached "Notice to Employees" in a conspicuous place in all New Jersey Branches, including all places where notices for employees are customarily posted, and maintain for a period of at least 180 consecutive days from the date of posting, said Notice to Employees to be signed by a responsible Respondent official and the date of actual posting to be shown thereon.

10. Respondents shall not retaliate or discriminate against Complainants in any manner for instituting or causing to be instituted any proceeding under or related to SOX.

Respondent and Complainant have 30 days from the receipt of these Findings to file objections and request a hearing before an Administrative Law Judge (ALJ). If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with:

> Chief Administrative Law Judge
> U.S. Department of Labor
> Suite 400N, Techworld Building
> 800 K Street NW
> Washington, D.C. 20001-8002
> (202) 693-7542, Facsimile (202) 693-7365

With copies to:



The opposing parties

U.S. Department of Labor - OSHA
Regional Administrator, Region II
201 Varick Street, Room 670
New York, NY 10014

U.S. Department of Labor - SOL
Regional Solicitor, Region II
201 Varick Street, Room 983
New York, NY 10014

U.S. Department of Labor, Associate Solicitor
Division of Fair Labor Standards
200 Constitution Avenue, NW, N2716
Washington, D.C. 20210

In addition, please be advised that the U.S. Department of Labor generally does not represent any party in the hearing; rather, each party presents his or her own case. The hearing is an adversarial proceeding before an Administrative Law Judge (ALJ) in which the parties are allowed an opportunity to present their evidence *de novo* for the record. The ALJ who conducts the hearing will issue a decision based on the evidence, arguments, and testimony presented by the parties. Review of the ALJ's decision may be sought from the Administrative Review Board, to which the Secretary of Labor has delegated responsibility for issuing final agency decision under SOX. A copy of this letter has been sent to the Chief Administrative Law Judge along with a copy of the original complaint. The rules and procedures for the handling of SOX cases can be found in Title 29, Code of Federal Regulations Part 1980, a copy of which was sent to you earlier, and may be obtained at www.osha.gov.

Sincerely,

Robert D. Kulick
Regional Administrator

cc:   Kenneth A. Goldberg, Esq., Goldberg & Fliegel LLP (Federal Express #8582 5805 2289)
      USDOL/OALJ-Chief Administrative Law Judge
      USDOL/SOL-FLS
      USDOL/SOL-Region II
      Securities & Exchange Commission



# NOTICE TO EMPLOYEES

PURSUANT TO AN ORDER BY THE U.S. DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION:

**THE CHARLES SCHWAB CORPORATION** (SCHWAB) has been ordered to make whole two employees who were found to have been retaliated against for exercising their rights under SOX. Schwab has also taken affirmative action to ensure the rights of its employees under employee whistleblower protection statutes including the Sarbanes-Oxley Act of 2002.

**PURSUANT TO THAT ORDER, SCHWAB AGREES THAT NEITHER SCHWAB NOR ANY OF ITS SUBSIDIARIES WILL:**

1. Discharge or in any manner discriminate against any employee because such employee has engaged in any activity, filed any complaint or instituted or caused to be instituted any proceeding under or related to the employee protection provisions of Section 806 of the Corporate and Criminal Fraud Accountability Act, Title VII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1514A (SOX), or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself/herself or others of any right afforded by SOX.

2. Discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee because such employee provided information, caused information to be provided, or otherwise assisted in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of 18 U.S.C. section 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud), any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

3. Harass, intimidate or retaliate against employees because such employees contacted, spoke with, or cooperated with Occupational Safety and Health Administration (OSHA) officials or other government officials during the course of an investigation.

_____
The Charles Schwab Corporation                                    Date

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE. THIS NOTICE MUST REMAIN POSTED FOR 180 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST BE NOT ALTERED, DEFACED, OR COVERED BY OTHER MATERIAL.**

